JOHNSON v. BORDERS.

Opinion delivered October 16, 1922.

1. HABEAS CORPUS—CUSTODY OF INFANT.—A father is entitled to the custody of his infant child, as against the infant's maternal grandparents, notwithstanding his religious belief as to divine healing, where there was no reason to believe that he would not procure medical attention for the child if it should become ill.

2. HABEAS CORPUS—CUSTODY OF INFANT.—As between the father and other persons, even the mother, where there are tender

sympathies on each side that may be relied upon, the custody of an infant will generally be awarded to the father.

Appeal from Cleburne Chancery Court; *Lyman F. Reeder,* Chancellor; reversed.

*J. Allen Eades,* for appellant.

WOOD, J. On the petition of the appellant, the chancery court of Cleburne County issued a writ of habeas corpus directed against the appellees, to determine whether or not they were entitled to the custody of Cessal Johnson, the infant son of appellant. At the hearing of the writ the appellant, in his own behalf, testified that he was father of the infant, who was about fourteen months old. He stated that he had 120 acres of land and a good team of mules, a wagon, a buggy, two cows, chickens and hogs, and that he was abundantly able to maintain his child. When his wife died on October 6, 1921, the child was sick, and his mother-in-law, Mrs. Vena Borders, wanted to take the child to her home, and the appellant allowed her to do so on the 11th day of October, and the child had been sick ever since. On the 27th of October the appellant went by to see the baby and bring it home if it were well. They told him it was well, but refused to let him take it home, and they had continued to refuse, and he sought to obtain possession of the child through this writ of habeas corpus. He testified that he had affection for his child and wanted to keep it, and that the child knew him and seemed greatly attached to him. His testimony tended to prove that he let Mrs. Borders, his mother-in-law, who was at his home at the time his wife died, take charge of the child; that she told him that the doctor who had been in attendance on the child's mother said that the child would have to have a trained nurse or she would have to take it, and appellant told her that she could keep it and care for it herself. Appellant believed that she would take good care of the baby, and she asked appellant to come to see it at any time, and told him to go home with her and stay with the baby, and appellant told her that he could not do so. His testimony

further showed that when he went to get the child, B. B. Borders, the child's grandfather, met appellant at the gate and abused him, called him "hard names," and assaulted him and did not permit him to go in and see the baby, and he had to leave without getting the child. He further stated that if the court awarded him the custody of his child he would give it medical treatment, should it become ill. He stated that he was a member of the Church of God; that he believed in divine healing. He also believed in doctors, and stated that doctors were all right, but he believed that the Lord could heal, too, if any one has faith enough to trust Him. He stated that all his people believed the same way. At that time he was living at the home of his father. His mother and sister would assist him in taking care of the baby.

Appellant's sister corroborated the testimony of appellant to the effect that B. B. Borders called appellant bad names and assaulted him when he went to get the baby, and would not allow him to see or take the baby. Her testimony, and the testimony of appellant's mother, corroborated his testimony to the effect that he was well able financially to take care of the child, and that if the custody of the child were awarded to the appellant they would look after it, care for it, and assist in giving it medicine if it needed it.

The testimony of all these witnesses was to the effect that appellant did not refuse to have a doctor for his wife in her last illness, and that he did not refuse to give her medicine, but that on the contrary he had the doctor and endeavored to get his wife to take the medicine left by the doctor for her, which she finally refused to take. Their testimony tended to prove that they were members of the Church of God; that they believed in divine healing in a way. Mrs. Johnson, appellant's mother, testified that she gave her own children medicine, and that she was willing to give Frank's baby a mother's attention if she were awarded its custody.

There was testimony on behalf of the appellant tending to prove that he bore a good reputation for honesty and morality. There was also testimony to the effect that the Borders regularly attended the meetings of the Church of God, and that B. B. Borders would speak in these meetings and ask the prayers of the people. There was some testimony to the effect that Borders acknowledged, in one of these meetings, that he had family troubles; that it was the wrong way to live, and asked the members of the congregation to pray for him. It was in evidence on behalf of the appellant that there was no tenet of the religion of the Church of God that prohibited its members from getting a doctor or using medicine.

On the other hand, the testimony on behalf of the appellees tended to prove that the appellees did not let the appellant take the child in controversy for the reason that he had refused to give his wife the proper medical attention during her last illness, and they were apprehensive that he would, on account of his religious fanaticism, fail to give the baby the proper medical attention should it become ill. The testimony on behalf of the appellees tended to show that the appellant stated, in the presence of the doctor, during the last illness of his wife, that she did not need any medicine, and that the appellant's mother, who was in attendance at the bedside, also stated that the patient didn't need any medicine, and other people also who were there stated that the appellant had complied with the law, and they didn't want the doctor's medicine.

But it could serve no useful purpose to further set out in detail the testimony adduced at the hearing to support the respective contentions of the parties. It suffices to say that the testimony on behalf of the appellant tended to prove that he had not failed to give his wife the necessary medical attention during her last illness, while the testimony on behalf of the appellees tended to show that he had failed to give her such attention. It is clear from all the testimony adduced on behalf of the

appellees, that they would have been willing to allow the appellant to take and keep his child except for the reason that they were fearful that he, on account of his belief in divine healing, would not give the child the proper medical attention should it become ill.

After hearing all the testimony, the court found "that the interest of said infant child, Cessal Johnson, will be best served by remaining in the custody of respondents." The court entered a decree allowing the appellees to retain the custody and care of the child until further orders of the court, with permission to the appellant to visit the child at the home of the respondents at all reasonable times, and retained "control of the child for such future action as may be for its best interests." From that decree is this appeal.

Conceding that the preponderance of the evidence warrants the conclusion that appellant, during the time of his wife's last illness, did not give her the proper medical attention, and also did not give his infant child the proper medical care immediately after the death of its mother, nevertheless we are convinced, from all the testimony of this record, that such treatment of his wife and baby at that time did not justify the chancery court in awarding the custody of the infant to the appellees, its maternal grandparents. For the undisputed evidence shows that the appellant is a man of good character, and that he is abundantly able financially to care for his child. The appellant lived with his father. His mother and sister both testified that they would assist him in looking after the child. They would give it "a mother's care."

Now, while the undisputed testimony showed that appellant and his mother and sister believed in divine healing, yet the testimony also showed that no tenet of their religion required that they should not have a doctor or take medicine in cases of illness. On the contrary, they all testified that the children of Mrs. Johnson took medicine when they needed it, and they further testified

that, if the child were brought to their home and should become ill, they would at once give it medicine. Mrs. Johnson had seven living children and had lost one, and she stated that she gave her children medicine when they got sick and needed it. It therefore appears that, notwithstanding their belief in divine healing, the appellant and his mother and sister, who were to stand in the place of a mother to this infant, asserted that there was nothing in their religion to deter them from giving the child medical attention, should it become ill, and that they would give it such treatment. Under this testimony, if the father should be denied the custody of his child, it would be purely because of his religious belief and the apprehension that because of such belief the child would not have the proper care and attention during any illness that might befall it. But the learned trial court was not justified in indulging such apprehension, in view of the testimony of appellant and his mother and sister that their religious belief would not stand in the way of medical aid for the child should it become necessary.

In *Lipsey* v. *Battle,* 80 Ark. 287, we said: "The courts may remove the child from the custody of its parents, but this should only be done when it is plainly necessary to secure the present and future well-being of the infant." And in *Verser* v. *Ford,* 37 Ark. 30, we said: "As between the father, too, and the mother, or any other near relation of the infant where sympathies on either side of the tenderest nature may be relied on with confidence, the father is generally to be preferred." See, also, *Wofford* v. *Clark,* 82 Ark. 461; *Baker* v. *Durham,* 95 Ark. 355.

For the error indicated, the decree is reversed and the cause will be remanded, with directions to the chancellor to enter a decree giving to the appellant the custody of his child, and also with directions to enter an order giving to the appellee the privilege at all reasonable and convenient times to visit the child. The chancery court

was correct in retaining the jurisdiction of the cause, and will still retain same, to make such orders as it may deem necessary at any time to protect and preserve the rights of the infant and the parties hereto, as above indicated.